Esteemed judges of the panel, I'm James Spell on behalf of plaintiff appellant Noah Nathan in this matter. This matter comes here on appeal as a result of a total grant of summary judgment on a one count Title VII complaint from the district court based upon three, primarily three theories, one of Title VII discrimination, one of Title VII hostile work environment harassment, and one of retaliation for complaints about violations of Title VII. If it pleases the court, I would begin with the retaliation claim about which I believe there is the most factual evidence and the legal arguments that perhaps need the most explication. The district court below held that with respect to protected activity in this matter, that the only protected activity identified was the filing of an EEOC charge in approximately July of 2009. Ostensibly that was under the participation clause as opposed to the opposition clause of Title VII. Prior to the filing of that particular EEOC charge, Mr. Nathan had engaged in multiple and repeated complaints to his employer, his employer's HR department, and the management of Takeda regarding the discrimination, harassment, and retaliation that he believed that he was suffering. Of course, initially, the complaint was about discrimination and harassment, but as it proceeded, he began to say, and in addition, I believe that being retaliated against. When you say discrimination and harassment, you're referring to taking the child to school in the morning? I'm referring to the actions that were, with respect to the discrimination, I'm referring to the actions that flowed from his having been rebuked for taking the child to school under the shadow of being asked why it wasn't more proper for his wife to do that job. But don't you have to, haven't we held that you have to have some objectively reasonable belief that discrimination is afoot in order for there to be protected activity? Absolutely, Judge Wilkinson. The test, of course, is that the employee have, when they make the complaint, a good faith belief, meaning in that sense. It's not a good faith belief. It has to be an objectively reasonable belief. The second part of the test, yes, Your Honor, is that the good faith belief also be objectively reasonable in light of the facts. The interesting thing about the case law and what sort of puts it in tension and difficult to sort of comprehend exactly what is meant by objectively reasonable under the facts is that. What's objective, I mean, what's discriminatory about policies that are neutrally applied and applied across the board? What's so discriminatory that somebody started at 8 a.m. in the morning, not just female sales reps or not just male sales reps, but every sales rep started at 8 a.m. in the morning and familiarized themselves with the products that they're going to sell? What's so discriminatory about that? I mean, those are, they seem to me that they would be policies that any company with a sales force would want to adopt. The only thing that we know with respect to the reasoning by Mr. Fouché as to why he singled Mr. Nathan out for this is that he was aware of his start time. But the only clue that he gave about what it was in particular that bothered him about Mr. Nathan and his start time and occasionally or at least sometimes during the week dropping his children off in his territory was that he had said on a number of occasions that it would have been, or at least said words that made it believable that he thought that it was a more appropriate task for the wife. He didn't say that, but he lured it to his mouth. But what's wrong with a supervisor wanting, trying to inquire about whether the company policies are being followed or whether there's some way in which the company policies would be followed? I mean, you don't want a workplace where every little inquiry about compliance with company policy becomes a trip wire for some sort of discrimination suit. You're going to get to the point where people can't even communicate. They're just afraid to open their mouths. Judge Wilkinson, if a series of complaints were made that contain language directed to the HR department, not to the decision makers, that causes them, because of those accusations, to get angry and that employer recognizes that what it's been accused of is a violation of the law, when that employee is punished for having made that complaint. You have to have a reasonable belief that discrimination is afoot in order to bring a retaliation claim. And I was just wondering what is the basis for the reasonable belief when you have, number one, policies that are perfectly reasonable. Number two, there's no comparator that I could find that seems to me that males and females were being treated similarly as far as I could ascertain. It didn't seem to me that there was a preference by gender, that everybody who was a member of the sales force of whatever gender was required to start at eight and get a certification when new products were introduced. It seems your clients are a little wily and want special treatment. The company's not obliged to do that. It is true that the company would not necessarily be obliged to give him special treatment. But the complaints that he was making about the treatment that he was receiving were not that he'd be treated specially, but that he'd be treated as everyone else was. From the moment that he made his… Everybody was required to go to work at 8 o'clock in the morning. That is correct, Your Honor. He didn't want to go to work at 8 o'clock in the morning. He wanted to go at 8.30. It was Takeda's practice, as described by Mr. Foucher's supervisor, that the actual Takeda… What entitlement does he have to special treatment? You can't run a company that way. I apologize, Your Honor.  I apologize, Your Honor. At the time of the… I'm sorry. Can I hear your question again, Your Honor? Excuse me? I have lost your question, Your Honor. I was following up on my colleague's question, Judge King's question, about everybody was required to start at 8. He wanted to start at 8.30. And my question was, why is the company obliged to give one person special treatment? That just demoralizes everybody. And it just seems to me you just have somebody who's very quiet. Your Honor, the testimony in the case is that other individuals were also beginning their workday at a later time than 8 o'clock. That the only one that Mr. Foucher was aware of was Mr. Nathan. In addition, Mr. Foucher, the direct supervisor, testified that it wasn't his expectation or Takeda's expectation that people be in the field at 8 o'clock, but rather it was the expectation of Takeda that they show up at the right number of doctor's offices in their territory, and that they make the right number of call details, and that they make sales. And Mr. Nathan at this time was one of the top salespeople in the country. Mr. Foucher was Mr. Nathan's fault. That is correct, Your Honor. He said at 8 o'clock, everybody's going to be at doctor's offices by 8 o'clock. Your client said your client didn't want to do it. That's the way I read the record. You're taking the view most favorable to him. And he did it. And he did, upon the heels of this, right after February when this began to heat up, he did make other arrangements in deference to his supervisor, Mr. Foucher, and notified Mr. Foucher that he was doing that. But the treatment continued. And the evidence that you're relying on is kind of an innocuous question about arrangements to take the older child to school. Can your wife take the child to school? That's what you're relying on here, right? Well, that is the only statement, Your Honor. Is that a fair recitation of what the statement was? That is a fair recitation of one of the statements. Well, how can you build a reasonable belief in discrimination on the basis of something that's that innocuous? Because wife carries with it a suggestion of sex, Your Honor. In the other Fourth Circuit case on this issue, the statement involved the words, someone else, as opposed to, in this case, your wife. Well, yeah. Mr. Foucher was aware that – Excuse me, Your Honor. I'm sorry, Your Honor. I'm just going to say, Mr. Foucher summarized in an email on December 12th, he said, I want to follow up on our conversation on November 20th about you having to start work at 8.30 a.m. every day because you have to drop off your child in school at 8.30 a.m. since they started in a new school. I fully support work-life balance and expect you to strive to achieve it, but in my opinion, consistently starting at 8.30 a.m. is not reasonable and fair to Kata or me. I mean, it seems to me to be about as innocuous and about a reasonable demand. If it were true, Your Honor, and the testimony reflects that that description of the conversation that they had was not accurate. Mr. Nathan had informed Mr. Foucher that there were only some days that he was not out in his territory at 8.30, but that on any days when he needed to be at a far point in his territory early in the morning because of a doctor's office or when he needed to get to somewhere in his territory because of a breakfast that he had managed to schedule that was early in the morning, then he always made arrangements that someone else would handle those duties. And ironically, in criticizing Mr. Nathan, Mr. Foucher, when he tried to arrange these organizations, took them to a doctor's office at 8.30 in the morning, and of course the record evidence reflects that what happened there was they were turned away because doctors don't meet with pharmaceutical reps at 8.30 in the morning. Well, this is not up to us to tell people how to run their company. Maybe they want you to get a little bit of a head start, get yourself organized before you begin to visit the office. I don't disagree with you, Your Honor. You don't just start work the minute the doctor's open. You've got to get your rep together and you've got to get your supplies together, and there's a little preparation involved on the part of every salesman before the salesperson actually starts making the calls. Anybody who's familiar with sales knows that you go to the office before you start making the calls. I don't disagree with any part of that, Your Honor, except for the use of the word they because the policy was not a Takeda policy. It was a policy of one rogue supervisor whose own evaluation of what Takeda's policies were were not approved by his supervisor. It was what his boss did, and that was what he required of the people that worked for him, a number of them, and they all had a uniformed start time of 8 o'clock. Makes a good impression, perhaps, on the doctor, as Mr. Boucher may have thought, to be out there early, to show up early. A lot of people like that. I mean, it is clear. I don't see where the sex part comes in here. That's dumbfounding to me. I mean, it's an innocuous statement. What about your wife? I mean, they've got a husband and wife. They're married. They've both got good jobs. They've got two children. I mean, they're working together on it. He asked a question whether it could be worked out. It sounds like to me. The EEOC guidelines, which are referenced in the brief and included as part of the joint appendix, quote the Supreme Court on this issue of gender stereotyping and expectations being different about males versus females. It's not ironic that the comparator that they offer, the one that they claim is a comparator, the JC person whose affidavit is part of the joint appendix. What did that ask about the grandparents? I mean, maybe they were around here somewhere. I take my grandchildren to school sometimes. I try to pitch in. I mean, a lot of people try to do that. Friends and neighbors. I mean, he made an inquiry. On the face of it, it's innocuous, as Judge Wilkinson said, neutral. There was other information suggesting that he was hostile to these kinds of child care issues, including that he had doctored a Takeda form to include having the individual reps say when they were off whether it was for child care or for another reason. Thank you, counsel. Yes, sir. Thank you. Thank you. We have some time for rebuttal. Good morning, and may it please the Court. My name is Dana Rust with McGuire Woods, and I'm here on behalf of Takeda Pharmaceuticals. The first thing I'd like to do for the Court is clarify some things in the factual record that the District Court relied on. The evidence, the undisputed evidence, is that Mr. Fouché was 100% consistent in requiring all of his subordinates to start at 8 o'clock. Mr. Nathan admitted this himself in his deposition, and I don't normally get into this at an appellate court argument, but this is a very succinct quote I'd like to read to the Court from his deposition. He said, yes, we all got the email saying start at 8 a.m., so everybody was told to start at 8 a.m. He then went on to say that everybody was irritated with him. Were there any comparators brought forward in this case? There were five comparators, Your Honor, that we submitted declarations for. Four of them were women, one of them was a man. Four of them had small school-aged children, one of them did not. But you were the one that submitted the comparators. Correct. Did the opposing counsel submit comparators? They did not. They did not identify a single person who was treated differently. So all of the evidence is consistent. Mr. Judge King and I were on the panel. Under the Lange decision, that's not very helpful if the opposing party doesn't submit a single comparator, is it? Right. They need a comparator in this kind of a case to prove their claim, and all the comparators go the other way and support our position and show that we have them all and they're all good to go. And they take the position that they're not comparators because there's no evidence they're child caregivers. And I don't know what that means because they're parents, they have small children who are school-aged, and I guess their position is just because they dealt with the requirement and made other arrangements. They're not comparators, but, of course, they are. They're the perfect comparators. One of them, in fact, a woman, her husband was a lawyer and they had small children. It doesn't get any better than that. Mr. Nathan's wife was a lawyer and they had small children. She was expected to show up at 8. Absolutely. All five of them were. Now there's this one comment that they make a great deal out of. In fact, I think their whole case hinges on whether this is somehow discriminatory, and it's this comment that Mr. Foucher made to Mr. Nathan, why can't your wife take the kids to school? And they argue that's gender stereotyping. They argue it's. . . No, you're reciting that as a quote. That is a quote, yeah. That's the light most favorable to him. Yeah, that's his version of the events. It's in the Joint Appendix at page 9394. Why can't your wife take the kids to school? And I think as the court recognizes, there's nothing discriminatory at all about that comment. Mr. Foucher was just looking to the other natural candidate to take the kid to school, which in this case happened to be a wife, but in the case of a female sales rep, it would be the husband. And, again, we have the four affidavits from the female sales rep saying they were held to the exact same standard. So you can't infer anything discriminatory at all about that comment. The other sort of storyline in the case, which the court has alluded to, is the training requirements for the new drugs that Takeda was rolling out. They had one they were manufacturing called Euloric, and as you would expect, Takeda wants its reps to be very familiar with those drugs before they call on doctors and pharmacies to sell them. And Mr. Nathan struggled with his knowledge regarding this drug, Euloric, and that's covered in several contemporaneous e-mails and warnings that he received at the time. You know, that's actually the familiarity with pharmaceutical products is rather important because in the whole chain of distribution of prescriptions and drugs and everything, the health system relies on knowledgeability all along the line. In other words, to give patients the best end care, the links in the chain from manufacturer to wholesaler to distributor to sales persons to doctors, the system relies for its safety and efficacy on knowledge and all these different links. And the more people know about what they're doing,  it's actually not some draconian policy from a health standpoint. It's very beneficial to have people understanding what the side effects might be. I mean, physicians rely on us. Over time, they come to have confidence in some sales representatives and they come to treat with a grain of salt all the puffing and half-baked statements of others. The knowledgeable salesman is going to gain the trust of the physicians and that will be a good working relationship. And somebody who's not knowledgeable and just puffs it through is not going to be very successful and not going to serve the health system very well. I don't understand why somebody should be hauled into court with a discrimination suit for doing what this person is doing. That's right. And Mr. Nathan was given multiple chances to prove he had knowledge of this drug, your Lord, your Honor, and he ultimately passed the tests that were given to him. He was certified, wasn't he, ultimately? He was ultimately certified. Well, he was actually certified once and it looked like it was pulled right out. And he kind of got decertified because of it. Decertified by, and then he was retrained. And then he was, exactly. Certified again. And we all talk about certification in this record. You're talking about certification by the company. That's right. Right? There's not any independent certification. Yeah, it's not an FDA certification or something like that. The satisfaction of the company. That's correct. But they have a very rigorous training program. They have professional trainers that they had in both Chicago and New Jersey. They sent him to both of them. And, again, if this was some retaliatory scheme and had to involve four or five people. Yes, Your Honor. It seems to me that something else is playing out behind the scenes here. Nobody's mentioned it yet, but there was a Key Tam action. Yes, there was. That he filed. And that was litigated in the district court. And there's a decision about it and it was litigated in the Fourth Circuit. A decision out of the Fourth Circuit, right? That is correct, Your Honor. I was not involved in that, but you are correct. But the point is, there's some time overlap with some of these various events. But, I mean, it seems to me that what may be happening here is he's trying to fit something that didn't fit before into a Title VII model. I think that's exactly, maybe, what we're going on here, sir. Y'all haven't claimed that's pertinent. It has not come up in this litigation, Your Honor. The only reason I mention it is because there were these two decisions out there. Very same parties. There's been a great deal of litigation. Two other factual points I want to make about the training is, Mr. Nathan admitted, well, he got an email where it said that, you know, confirming a conversation that he had with Savant, his boss's boss, and in that email he said that, you know, Mr. Nathan didn't remember that he didn't do certain things well in the training that was required of him and then that email was given to him in his deposition and he didn't quibble with it there. So it's really undisputed that he had problems with his training, but, again, got multiple chances. I'd like to turn now to retaliation because that's where Mr. Bell started and I think it is the most complicated claim. Is there anything that we overlooked in our discussion of that particular claim? On retaliation, one thing, Your Honor, that I think is important that I want to draw the Court's attention to is this, that after briefing was concluded in this case in June of this year, the Supreme Court handed down the University of Texas v. Nassar decision, and in that case Justice Kennedy, writing for the Court, concluded that you must have the stringent but forestander to prove causation in a Title VII retaliation case, which is what we have here. So that is the burden that they have to establish retaliation now under Title VII, the but forestander. That's a crucial question, though, even as you have to possess some sort of reasonable belief. Yes, and on that point, Your Honor, I'd like to call your attention to the Court's decision in Jordan versus Alternative Resources Corporation. In Jordan, an African-American employee was at work one day, watching TV in a break room when a news report announced that the D.C. snipers had just been captured. There was a white employee in the room with him at the same time who uttered a very vile racial slur. And I don't normally like to get into these sort of things, but I will because I think it's important to compare it to Mr. Foucher's comment, which is very benign in comparison. It's different as night and day, aren't they? Well, in Jordan, the white employee said in the presence of the black employee they should put those two black monkeys in a cage with a bunch of black apes and let the apes have sex with them. But he used worse words than that. Now, this Court held that he had no reasonable belief when he went to HR and complained about it. Not everybody on the panel agreed with that. Well, but this is the whole thing. I don't understand.  And my point, though, Your Honor. What are you getting into that for? What are you getting into it for? They're so different. They are different. So what are you trying to do, shoot yourself in the foot? No, no, no, Your Honor. My point is this. That epithet, which was vile, didn't rise to the level to give him a reasonable belief that he was suffering discrimination. And this certainly is not because the comment is so benign here. The comment, you know, can your wife take the kids to school? I mean, not in a million years is that going to be considered, under a reasonable standard, a hostile workplace when you compare that to the Jordan case where it was. So that's my only point on retaliation. On the gender discrimination claim, Your Honor, the battleground here is whether they need a comparator or not. The district court said they need one, they don't have one. All the comparators are in favor of Takeda, and they certainly are. But it is an element of a prima facie case and a gender discrimination case. And what we have here is a little bit different. It's what we call a gender plus case. Mr. Nathan doesn't say I was picked on just because I'm a man. Rather, I was picked on because I'm a man who wants to take his kids to school. So that's gender plus some other characteristic. And the Fourth Circuit hasn't weighed in yet on whether you need a comparator in that kind of case. Judge Wilson did actually, though, in a district court opinion that he issued called Robin Hess Watson versus Potter, and he got it right. You absolutely need to have a comparator in a sex plus case. Other circuits that have looked at this have all concluded you need a comparator. The most thoughtful opinion... I haven't gone to the Fourth Circuit, though, so we don't know whether I got it right. Well, I think you got it right, Your Honor. And I'm confident that your brethren on the bench will agree with you on that one. But in Coleman, the Tenth Circuit looked at it long and hard and said that you absolutely need a comparator in a gender plus case. And the Second Circuit did the same in Fisher versus Vassar, and the Third Circuit did the same in Bryant versus International Schools. And there's no principled reason not to require a comparator in a gender plus case when you do require a comparator in a gender case. In fact, the need for a comparator is even greater in a gender plus case because gender alone is no longer the determinative factor. You've got some other thing, some other fact that is sort of muddying the waters here. And when you have that other factor to sort through it and figure out if discrimination really is at play, you need a comparator. And that's what the courts have all concluded. That's what the trial court ruled. That's what Judge Wilson ruled in his case. And we think the Fourth Circuit should follow suit. On the hostile work environment claim, which is the remaining claim, the only point I'd like to make here is they're trying to fit a square peg in a round hole here. And what I mean by that is Mr. Nathan is using the same evidence in his hostile work environment claim for his retaliation claim.  He said they conflated the two at oral argument on summary judgment. And what I mean by that is that when you have a hostile workplace claim, you've got to prove it with things like insults, slurs, tasteless jokes, offensive language. I think we know where that's going. A company pursuing perfectly reasonable policies doesn't create a hostile environment  Is there anything further, sir? No, Your Honor, unless you have any questions for me, I'm done. Thank you. Mr. Bale. Thank you, Your Honor. I'd like to address Judge Wilson's one question about the overlap between the key tam and this action as to how it might have impacted what was going on at the company at the time. Well, I was just kind of taking judicial notice of the opinions that were out there. I didn't mean to stray into any other facts. The only fact, Your Honor, is that there was no overlap between the battle over certifications and what the other side has called the rigorous training program and what the district court judge below called a rigorous training program. One of the drugs, though, he was complaining about in the key tam is the one that he was supposed to be marketing. That is correct, Your Honor. That's involved here, so there is overlap. Yes, Your Honor, they do involve the same drugs. Your Honor, Judge Wilkinson, with respect to this rigorous training program and to what it would be fair to expect of the knowledge of a sales representative, prior to the initial battle over his start time and his complaints to HR, there was never a time when Mr. Nathan's knowledge about any drug was ever questioned. No record with the company of his ever having failed to certify on a first try. In fact, in Anaheim here, what begins this, at the very beginning of February, there is no record that he failed to certify there. In fact, Mr. Foucher testified that he certified him as to both drugs in Anaheim. Then immediately upon the return, a day or two after the return, he called him and asked him about the continued issues with the child care and said, now you need to be recertified. Aren't you really just describing what we see all the time in the workplace, which is a personality conflict between an employee and a supervisor that doesn't have much to do with any kind of discrimination. It just has to do with the fact that the chemistry isn't particularly good and they disagree over company policies and all the rest. That's basically what you're talking about. I don't believe so, Your Honor, and here's why. When Mr. Foucher says, okay, you're still doing that, calls him up an hour later, you need to be recertified, he goes out, he recertifies him. He doesn't know that Mr. Nathan has complained. He recertifies him on the only drug that he considers recertifying him for, and he writes a field coaching log that's in the exact same style, format, and level of sort of acceptable content that he had always given to Mr. Nathan on the ten previous occasions that he'd done it for him. He finds out. He finds out that Mr. Nathan has complained about him, and he, one, immediately tries to submit an amendment to make that field coaching log ban. Two, between he and Mr. Savant agree that he needs to be recertified now on both drugs that Mr. Foucher has previously certified him on one drug two times, one drug one time. And now that he knows that Mr. Nathan has complained about him, he fails to certify him on both drugs. And, in fact, he never again certifies him until... Isn't that just a disagreement about one thing or another around the workplace? I just don't see how you shoehorn it into a Title VII or a hostile environment case. I mean, people have disagreements with their supervisors all the time. I mean, it's unfortunate, but no human chemistry is not always perfect. This is a disagreement where, as a result of knowing that there was a pending complaint about discrimination, that the company was investigating, because it took it seriously, that they failed him on these drug recertifications that the same individuals had passed him on until they learned that they were the subject of the investigation. That's the most classic example of retaliation. And from that moment forward, they never again did anything other than work behind the scenes to mar his reputation. Mr. Savant would, on every performance evaluation that Mr. Nathan ever got from there forward until he was fired or until he left the company... Aren't you skipping over several steps? Yes, they have a reasonable belief that discrimination is afoot. And I think the other panel's questions, evidence of skepticism on that front? Yes, Your Honor. Although it's certainly in tension with the idea that the Fourth Circuit and the Supreme Court of the United States have recognized on several occasions, which is, even though that person must have a subjective reason, a reasonable belief, and even though there must be objective facts that would support it, they don't have to be right. And here, with respect to this comparator issue, we've got circuits that haven't reached the issue. We've got EEOC guidelines that say you absolutely don't need a comparator. And to expect that Mr. Nathan would have known those things in determining that that statement made by, or that series of statements made by... Wouldn't it have helped your case to have had a comparator? It would have helped the case to have a comparator, Your Honor. But you didn't have one. In the same way, Your Honor, that had he immediately filed a charge with the EEOC on the 9th of February, rather than making the complaints internally because it was participation as opposed to opposition, that test wouldn't be there, and every one of the things I'm describing as retaliation would have been considered without a pause. All right. Thank you, sir. Thank you, Your Honor. We appreciate it. We'll come down and speak to counsel, and then we'll take a brief recess.
judges: J. Harvie Wilkinson III, Robert B. King, Samuel G. Wilson